NOT FOR CITATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LISA PERRIZO, RANO PERRIZO, AND K.P., A MINOR, BY AND THROUGH HIS GUARDIANS AD LITEM LISA PERRIZO AND RANO PERRIZO,<br><br>Plaintiffs,<br><br>v.<br><br>SANTA CLARA COUNTY OFFICE OF EDUCATION, NANCY GUERRERO, CAROLINA LLURIA, APRIL CARLSON, DAVID DRIESBACH, AND DOES 1-30,<br><br>Defendants. | Case No. 5:15-cv-01512-EJD (HRL)<br><br>**ORDER RE DISCOVERY DISPUTE REPORTS 1-5**<br><br>Re: Dkt. Nos. 51-55 |

**INTRODUCTION**

Minor child K.P. was stricken by a rare disease that left him with permanent, severe mental disabilities and well as significant physical impairments. When he grew to school age, he was entitled to special education. During August and September 2013, when he was 11, K.P. was placed in a special education "orthopedic impaired" class at a local public elementary school taught by April Carlson ("Carlson"). He was in Carlson's class for 5 weeks. The time did not go smoothly.

Lisa and Rano Perrizo, K.P.'s parents, bring this lawsuit for themselves as well as on

K.P.'s behalf. Plaintiffs allege that during those 5 weeks Carlson deliberately abused K.P. and provoked him to engage in disruptive actions with the aim of getting him removed from her class. K.P. is non-verbal, so Carlson's challenged behavior came to light because one of the aides in Carlson's classroom sent to school authorities a lengthy e-mail (written "anonymously") deploring Carlson's classroom behavior, and especially---in very inflammatory language---how she was treating K.P. Later, a joint protest letter about Carlson's continued presence in the classroom was signed by 4 classroom aides (including the one who sent the earlier e-mail).

The suit is against Carlson, the Santa Clara County Office of Education ("SCCOE") (the provider of special education services to local schools), and also certain SCCOE employees who allegedly failed to prevent or stop Carlson's claimed mistreatment of K.P. There are 11 claims for relief, including some for common law torts and some based on statute (for example, discrimination under the Americans with Disabilities Act) or the Constitution (unreasonable force under the 4th Amendment and deprivation of due process under the 14th Amendment). Basically, the plaintiffs claim that K.P.'s 5 weeks in Carlson's class have damaged him for the rest of his life.

## DISCUSSION

Now before the court are 5 discovery dispute reports ("reports") filed by the plaintiffs. Four of the reports raise claims of misconduct by defense attorney Eric Bengtson ("Bengtson") during his defense of the depositions of 4 of the aides assigned to Carlson's class during the weeks in question. Plaintiffs charge Bengtson with improperly coaching the witnesses and ask for sanctions under Federal Rules of Civil Procedure 30(c)(2) (which requires objections during depositions to be "nonargumentative and nonsuggestive"), and 30(d)(2) (which authorizes sanctions for impeding, delaying, or frustrating a deposition). Plaintiffs raise a related claim that defense counsel should also be sanctioned for disobeying this court's standing order on how discovery disputes must be handled. Finally, the fifth discovery report seeks an order compelling responses to certain interrogatories. Defendants oppose all of the reports and argue that plaintiffs are not entitled to any of the relief they seek.

I.     **THE FOUR DEPOSITION REPORTS**

The deposition of Genevieve Vieira ("Vieira") was taken on February 25, 2016, as was that

of Patricia Olague ("Olague").  Ana Henriquez (Henriquez") was deposed on March 4. Natalie Acharya's deposition was begun on March 12 and completed on April 29th.  All were aides in Carlson's class.  Ms. Acharya ("Acharya") is the one who sent the explosive, anonymous e-mail.  Basically, plaintiff's counsel argues that Bengtson engaged in a persistent pattern of coaching each witness by making speaking objections and uncalled for comments and suggestions, all aimed at cueing each witness to not be forthcoming in her testimony (i.e, asking if the deponent understood the pending question, which might be taken as a cue to say "no" even though the witness really did understand it).

### A.   Vieira Deposition

Vieira's deposition is 183 pages long.  In the report, Teresa Li ("Li"), the plaintiffs' attorney who took the deposition, cites 45 instances of Bengtson's improper coaching.  The court has read each of them.  Unfortunately, a fair appraisal of many of them depends on the context, and the context is not always apparent.[1]

An objection that a question misstates previous testimony cannot be evaluated without the benefit of knowing what the earlier testimony was (which Bengtson did not rehash as part of his objection). Another problem for the court was that many of the questions that sparked a claimed improper objection depended on whether Li was framing a question that repeated something said in a document (probably the e-mail or the joint protest letter) or changing or mixing up the words in the question from how they appeared in the document.  And, most of the cited instances do not, in the court's mind, look at all like argumentative or suggestive "coaching."  Consider these examples:

*Example 1*

Q:  Do you know anything about Betsy Fitch asking April not to keep microwave at some locations in the class?

MR. BENGTSON:  Vague and ambiguous.  Lacks foundation.

A:  I don't know.

---

[1] The court was not furnished with the complete deposition transcripts.

3

1   (Dkt. 54, Vieira Depo. at 122:5-10).

2   *Example 2*

3   Q:  Have you heard other people seeing rats on school property?

4   MR. BENGTSON:  Overbroad as to time.  Go ahead.

5   A:  I don't remember.

6   (Id., 122:17-21).

7   *Example 3*

8   Q:  Did you see April Carson spending lots of time emailing?

9   MR. BENGTSON:  Vague and ambiguous.  Go ahead.

10  A:  I'm not sure, like, how long she was on the computer.

11  (Id., 128:3-8).

12  *Example 4*

13  Q:  Did you mention the "spooky house project" to Nancy and Carolina?

14  A:  I don't remember but it says it on here.

15  MR. BENGTSON:  She doesn't want you to assume.  She is just asking if you remember.

16  THE WITNESS:  No.

17  (Id., 132:17-22).  Nancy and Carolina apparently are special education administrators.  Li is

18  obviously showing the witness a document.  While the objection is gratuitous, and came after

19  Vieira's responsive answer, it was neither distracting or suggestive that the witness should say

20  something different.

21  *Example 5*

22  Q:  Okay.  And the next one is, "Spends a lot on her computer during the day."  Did you

23  tell Carolina and Nancy that April spends lots of time on the computer during the day

24  doing emails?

25  MR. BENGTSON:  I'm just going to object that it mischaracterizes the document, the

26  text of the document.  It says "IEP or emails."  Go ahead and answer.

27  THE WITNESS:  Did I say this?

28  BY MS. LI:  No.  That is not my question.

1    A:  Oh.  What is your question?

2    Q:  I didn't ask that question, and counsel is trying to obstruct the process.  But, my

3    question was:  Did you tell Carolina---don't look at the document.  Did you tell Carolina

4    and Nancy that April spends a lot of time on her computer doing emails?

5    A:  I don't remember.

6  (Id., 142:2-19).  Li apparently is reading from some document and then posing a question to

7  Vieira.  Bengtson thinks she misquoted the document.  The court cannot tell.  The attorneys spar

8  about arriving at a clear question, which finally occurs, and the question is answered.  The court

9  does not see that as Bengtson "obstruct[ing] the process."

10    Another problem that the court sees in a good number of these instances is that Li does not

11  always ask very clear questions:

12    *Example 1*

13    Q:  Did anybody talk about that before the anonymous email was sent amongst yourselves?

14    A:  No.

15    Q:  Did anybody talk about they were frustrated about the fact that April Carlson was

16    abusing [K.P.]?

17    MR. BENGTSON:  Lacks foundation.  Argumentative.

18    MS. WILSON:  Join.

19    THE WITNESS:  No.

20  (Id., 52:17-24).  These objections were well taken.

21    *Example 2*

22    Q:  Have you seen April Carlson intentionally trigger [K.P.]'s episodes in order to remove

23    him from the class?

24    MS. WILSON:  Objection.  Asked and answered.  Lacks foundation.  Vague and

25    ambiguous and argumentative.

26    MR. BENGTSON:  Join.

27    THE WITNESS:  No.

28  (Id., 72:7-14).  These objections were well taken.

United States District Court
Northern District of California

*Example 3*

Q: Okay. So from 2005 to 2012, when you were in April's class, you never saw any videos being played?

MR. BENGTSON: Lacks foundation.

MS. LI: Is that a no?

MR. BENGTSON: Misstates testimony.

THE WITNESS: We saw videos but hardly ever.

BY MS. LI: Would you say once per semester or less than that?

A: Less than that, less than that.

Q: Maybe one during the whole time?

A: Yes.

Q: Okay. And then in 2013---

MR. BENGTSON: You mean the whole time, like one each year or during the entire period, the seven-year period?

THE WITNESS: Oh, one each year.

(*Id.*, 140:7-22). Li's follow up question really was unclear, and Bengtson's clarification was not disruptive or suggestive.

*Example 4*

Q: Do you consider April Carlson to be a very patient teacher?

MR. BENGTSON: Overbroad as to time. It is vague and ambiguous. Go ahead.

THE WITNESS: No.

BY MS. LI: Can you elaborate on that?

MR. BENGTSON: What is the question? "Elaborate," it calls for a narrative. It is vague and ambiguous. Overbroad.

BY MS. LI: Go ahead.

MR. BENGTSON: If you understand, you can go ahead.

THE WITNESS: I don't understand. Elaborate on what?

BY MS. LI: On the fact that you don't think April Carlson has patience as a teacher.

6

1  A:  No. I can't elaborate on that.

2  Q:  You cannot because you don't understand what "elaborate" means or---

3  MR. BENGTSON:  Wait. It is a vague and ambiguous question. Now you are getting

4  argumentative.

5  BY MS. LI:  Okay. Was April Carlson easily---was she an angry person as a teacher

6  during the time that you were in her class?

7  MR. BENGTSON:  Overbroad as to time. It is vague and ambiguous. Go ahead.

8  THE WITNESS:  No, not angry.

(Id. 73:17-74:20). Bengtson's objections to the question "Can you elaborate on that ?" are fair. It probably would have been better to ask Vieira why she thought Carlson was not a patient teacher, and to ask for examples Vieira saw or heard of that contributed to her opinion.

Nevertheless, Bengtson did step over the line sometimes:

*Example 1*

Q:  Have you asked to give any written statements after the anonymous email was sent about April Carlson's class?

MR. BENGTSON:  You mean has she been asked to?

MS. LI:  That is not my question.

MR. BENGTSON:  Has she asked someone if she could give a written statement? Is that what the question is?

MS. LI:  If you have objection, you can make objection.

MR. BENGTSON:  Yeah. I'm going to just try to get clarification for the witness's sake and a clear record. And I can't tell---

MS. LI:  I think the record is clear. You cannot tell the witness. You can't tell---

MR. BENGTSON:  You don't need to argue with me. Just go ahead and ask a new question.

BY MS. LI:  Do you understand my question?

MR. BENGTSON:  No, she doesn't.

THE WITNESS:  No.

MR. BENGTSON: We are going to make sure we get a clear question. Okay?

(Id., 18:12-19:7). Bengtson should not have objected to the question posed, as it was clear enough, nor should he have taken it upon himself to state that the witness did not understand it. However, the question, when repeated, was not objected to and was answered.

*Example 2*

Q: And you didn't get any email from the reporting.abusive.teacher@gmail.com?

MR. BENGTSON: Lacks foundation. Calls for speculation.

THE WITNESS: No.

(Id., 172:22-173:1). The question, although awkwardly phrased, does not lack foundation or call for speculation. Vieira answered it promptly, and the deposition continued on.

*Example 3*

Q: Did you tell Nancy and Carolina that April grabbed [K.P.]'s clothes to move him when he acts up?

MR. BENGTSON: She is asking if you used those specific words.

THE WITNESS: I don't---I don't know. I don't remember if I used those specific words.

(Id. 133:14-19). It is difficult for the court to appraise this instance, but Li may have been reading from a document. It seems that Bengtson's "clarifying" remarks were not warranted. In any event, the follow up question about whether Vieira had "said something to that effect" was not objected to and Vieira answered affirmatively.

*Example 4*

MR. BENGTSON: Are you claiming that [K.P.] got a disease from rats in this case?

MS. LI: If you have objection, you make the objection.

MR. BENGTSON: I'm just asking. There is not even a question pending. I was just asking.

MS. LI: You cannot ask questions. If you want to ask her a question, you can go ask her questions.

MR. BENGTSON: I was just asking you if that is one of the claims being made.

(Id., 124:2-11). This was a gratuitous and snide "question" by Bengtson to Li that was inspired by

8

a previous question from Li about whether Vieira knew if Carlson had been asked not the keep a microwave oven in her classroom because of "the rat issue." It is not clear to the court why Li was interested in the classroom microwave, but surely Bengtson knew what the claims for relief were, and none were about rats making K.P. sick.

### B. Olague Deposition

Patricia Olague's deposition is 306 pages long. The court has been given 111 of those pages, which contain 45 instances of alleged coaching by Bengtson. The court's discussion above about the Vieira deposition applies as well here. Many of the instances here were benign, not at all as Li characterizes them. Some were clearing up confusion sowed by poorly phrased questions from Li. True, some of the objections and comments by Bengtson were not called for, although the court does not get the feeling that he was trying to disrupt the proceeding.

There is one instance that may be worthy of comment, although the court chooses not to quote it because it goes on for 7 pages. Li was pushing a witness to adopt a statement in the anonymous e-mail (that she did not author) characterizing the enclosure that Carlson assembled out of bookcases (to separate K.P. from classmates because of disruptions that otherwise occurred) as a "three by four cell block." (Others called it the "quiet corner.") Olague said she did not know its dimensions. Li wanted more, asking whether she had any reason to disagree with that description. Olague said she did not know how to answer that, and at that point Bengtson asked for a restroom break. Li, apparently concerned that Bengtson was going to coach the witness during the break, refused to go off the record. Bengtson, becoming perturbed, indicated he would not talk to the witness during the break, but Li was not convinced. Maybe Bengtson was going to leave Olague in the deposition room while he went out, and then maybe he changed his mind because of Li's perceived intransigence. It is hard to tell because tempers clearly flared on both sides and professionalism faltered. The court does not know whether Bengtson talked to Olague during the break, or even for sure if a break took place.[2] It would be improper to take a break to talk to a witness during a line of questioning. Was this a genuine emergency? Leaving the

---

[2] Olague was not asked if she talked to Bengtson during the break, which makes the court wonder whether it actually took place.

9

witness behind during counsel's restroom break should have been sufficient if that were the case. In any event, the court does not see this instance as coaching. Maybe, an attempt to coach? The deposition ultimately resumed, and Olague answered questions, qualifying that she would not call the enclosure a cell block.

### C. Acharya Deposition

Li cites to 49 instances of improper coaching by Bengtson during Acharya's deposition. The court does not know how many pages the deposition ran, but the last cited instance of alleged coaching was on page 274. Once again, most of the objections were appropriate, and again there are some legitimate uncertainties about exactly what was being asked in some of Li's questions. Nevertheless, the court feels Bengtson did now and again cross the line into improper coaching:

Q: And then you said somewhere that it says on Exhibit 2, Exhibit 1 on page 2---

A: Yes.

Q: Can you read the sentence in the first paragraph, the four lines above from the bottom that starts with "KP is also manhandled."

A: Do you want me to complete the paragraph?

Q: Yes.

A: "KP is also manhandled often by April. Staff has witnessed her violently jerking him around by his clothing, holding his wrists, and forcefully shoving him away from other students when he is trying to be affectionate to them. She has made him a monster in the eyes of our school community and many of the students are afraid of him because she makes such a raucous when he tries to communicate with them."

Q: Okay. Did you see April Carlson manhandle [K.P.]?

A: I saw her directing him by his pants and his shirt.

Q: What does "manhandle" mean to you, the word?

A: I don't know exactly.

Q: Do you know somewhat what "manhandle" means?

MR. BENGTSON: How can she somewhat know what it means?

MS. LI: She said she didn't exactly. If you have an objection, you can state so.

1 Otherwise, you are coaching the witness. I'm warning counsel one more time.

2 MR. BENGTSON: I'm not coaching. I'm not coaching. I'm just asking. How can

3 someone somewhat know what it means? That is all I am asking, Teresa. I am not trying

4 to coach.

5 MS. LI: Do you have objection?

6 MR. BENGTSON: I'm just trying to get a clear record.

7 MS. LI: Are you telling the witness that she shouldn't be understanding this question?

8 MR. BENGTSON: No, absolutely not.

9 MS. LI: Is that what you are saying? Because you are telling her that how can anybody

10 understand this.

11 MR. BENGTSON: The question doesn't even make sense.

12 MS. LI: Oh, okay.

13 MR. BENGTSON: How can you somewhat understand the definition of a word?

14 THE WITNESS: I can't define "manhandle" for you.

15 (Dkt. 51, Acharya Depo. at 149:13-151:13). It was Acharya's e-mail that used the word

16 "manhandled," so this line of questioning is proper, even though in other testimony Archarya said

17 that "manhandled" was a word she added to the draft of her e-mail at the suggestion of the parent

18 of another student. When Archarya said she did not "exactly" know what the word meant, Li's

19 next question was whether Archarya knew "somewhat" what it meant. Bengtson's comments

20 about that do look like coaching, suggesting that no one could answer a question that he claimed

21 did not make sense. The witness seemed to take the cue. Nonetheless, in the portion of the

22 deposition that immediately followed, Li did elicit from Acharya her understanding of what the

23 word meant.

24 **D.     Henriquez Deposition**

25 The Henriquez deposition only went on for 50 pages before Li terminated it for what she

26 felt was continuous coaching by Bengtson. As with other instances, the court is not given the

27 context of the question, but someone must have put in writing or testified that K.P. was "dragged ..

28 . . across the ground" by Carlson. So, Li asked Henriquez whether she had received training to

United States District Court
Northern District of California

1  recognize whether dragging a child across the ground was child abuse.  Henriquez answered that
2  she did not recall "that being mentioned."  Li complained that answer was not responsive to the
3  question about "training."  Bengtson opined that the question had been answered and that Li
4  should ask another.  Then, Henriquez said, in answer to another question that tried to draw a
5  distinction between "mention[ing]" and "training," that she did not understand the question.
6  Whereupon, Li asked:  "What do you mean you don't understand the question."  That provoked
7  Bengtson to object that that question was argumentative, which caused Li to take umbrage.  A
8  couple of times, Bengtson cut off the witness from trying to explain why she did not understand
9  the question---which he should not have done---and that really irritated Li.  Back and forth the two
10 attorneys went until Li called off the deposition.  In between the attorneys' squabbling, Henriquez
11 actually did answer Li's inquiry.  She testified they were trained to recognize signs of child abuse
12 such as bruises, cuts, or other marks.  If she saw someone dragging a child across the floor, her
13 response would depend on what was going on, what the situation looked like to her.  She was
14 trained to report abuse if she thought that was what she was seeing, but was not specifically
15 trained that dragging was child abuse.  This was not the finest moment of either lawyer.  Although
16 Li's questions were not as precise as one would wish to see, Bengtson's reaction to them struck
17 the court as overbearingly intrusive.

### E. Deposition Recap

19 Many times, Bengtson's objections were perfectly appropriate.  Many times Li's
20 awkwardly phrased questions invited objection.  True, once in a while Bengtson did coach the
21 witness and needlessly quibbled over the phrasing of a question.  (He might have avoided some of
22 that if he had spent more time preparing the witnesses for giving testimony.)  The court feels some
23 remedial action directed to Bengtson is warranted, and that will be explained later in this order.
24 However, the court is not convinced that plaintiff's discovery efforts have been thwarted, or that
25 their case has been badly undermined.  Indeed, their case is principally based on the anonymous e-
26 mail and the joint protest letter from the classroom aides.  These were not depositions needed to
27 dig out the crucial facts.  These depositions could have either driven home the inflammatory
28 language in those documents by getting the witnesses to affirm that language under oath or, if the

aides now backed off the inflammatory language, to establish possible grounds for impeachment. Either way, the court thinks the plaintiffs come out all right.

Plaintiffs ask the court to strike defendants' answer and to issue an "evidentiary sanction" (negative inference, issue preclusion?). If plaintiffs were to get the answer stricken, they would not need the evidentiary sanction. Either of these sanctions would ultimately be up to the presiding judge, but on this record, this court will not recommend anything so drastic. Plaintiffs also ask for monetary sanctions (presumably, attorney's fees), but this court declines to award any because they are not warranted by the frequency or severity of Bengtson's missteps.

## II.   THE REPORT ON INTERROGATORIES 6-8

As a result of a public records request, plaintiffs obtained a cryptic, handwritten note with jottings that appear to refer to abuse, something about feeding or overfeeding, vomiting, Carolina seeing bathroom incidents [Carolina Lluria, principal of special education at a cluster of Santa Theresa schools], and "doing nothing." (Dkt. 55, Ex. 1).

The interrogatories in question ask for the particulars of what the note refers to. No, say defendants. First, they say the note was produced in error and should not have been. Second, they argue that the note describes something happening at another school and has nothing to do with teacher Carlson or K.P. Third, defendants contend that privacy considerations apply to this unnamed student. Nonsense, say plaintiffs. In their view, this might be evidence of a policy or practice by SCCOE of deliberate indifference to students with disabilities. However, there are no Monell[3] allegations in the complaint. There is no need for proof of a pattern or practice of deliberate indifference. All that is needed is proof as to K.P. Plaintiffs' request for an order compelling this discovery is denied. Fed. R. Civ. P. 26(b)(1)and 26(b)(2)(C)(iii).

## III.   FAILURE TO MEET AND CONFER

Plaintiffs also seek an award of monetary sanctions for the failure of defendants' lead counsel to meet and confer with plaintiffs' lead counsel over the deposition disputes and the unanswered interrogatories. This is a legitimate grievance. First, some background.

---

[3] Monell v. Dep't of Social Services, 436 U.S. 658 (1978).

13

1    Over many years as a civil litigator and more recently as a judge, the undersigned has

2  concluded that many attorneys are too quick to file a discovery motion rather than go to the effort

3  of sitting down with the other side and attempting to negotiate an amicable solution to their

4  discovery dispute.

5    And, when junior lawyers are handling discovery (which is often the case when a law firm

6  is involved), they may be inclined in order to establish their mettle to take a very aggressive

7  position when either seeking or resisting discovery.

8    Also, this court has the assigned responsibility to resolve discovery disputes, if the lawyers

9  cannot work them out, in literally hundreds of cases.  There are sometimes so many discovery

10  matters filed that they tax the court's resources.

11    To address the problems facing the court with discovery disputes, in 2011 the undersigned

12  adopted a Standing Order re:  Civil Discovery Disputes ("Standing Order").  It dispensed with

13  noticed motions and substituted a short joint statement to be filed by the parties but only after an

14  unsuccessful face-to-face meeting with lead counsel.  The personal participation of lead counsel

15  was of special importance to the court because they are the experienced lawyers whose judgment

16  on when to fight and when to back off should be better than that of less experienced attorneys.

17  Compared to beforehand, the Standing Order has substantially reduced the discovery disputes that

18  are now brought to the court for a ruling.

19    Early on, long before the fourth deposition, Li was dutifully trying to arrange a meet and

20  confer session between lead counsel for plaintiffs and for defendants.[4]

21    This case presented exactly the situation contemplated by the Standing Order.  Li has 5

22  years of experience and Bengtson has 9.  Peter Alfert ("Alfert"), plaintiffs' lead counsel, and Mark

23  Davis ("Davis"), defendants' lead counsel, each have well over 30 years of experience.  The senior

24  lawyers, benefitting from their long experience, could have addressed the friction between Li and

---

[4] It is regrettable that Li, as soon as she encountered what she felt was unacceptable coaching during a deposition, did not take advantage of Civil L. R. 37-1(b).  That rule authorized her to place a call to the undersigned during a deposition to see if the court could address the problem right then.  Had she done that during any of the depositions, and had the court been available, the matter may well have been dealt with to her satisfaction, thus avoiding the time and effort involved in eventually bringing it to the court's attention through four lengthy reports.

1  Bengtson and worked it out. At least, they should have tried. The Standing Order requires it.

2  Such a meeting never took place, and it was not for lack of effort by Li.

3      There is no doubt that Bengtson (and, surely, Davis) knew of the lead-counsel-meet-and-

4  confer requirement in the Standing Order. Li brought it up several times. Indeed, the subject even

5  came up in open court at a status conference before the presiding judge on April 25, 2016 (4 days

6  before the second session of Acharya's deposition). Li complained to Judge Davila that discovery

7  disputes had arisen from the depositions, and that she was not getting cooperation from Bengtson

8  about scheduling a face-to-face meeting with lead counsel, a meeting which was a predicate to the

9  filing of the required joint discovery reports which would be addressed by the undersigned. When

10 Judge Davila turned to Bengtson about complying with this court's Standing Order on a lead

11 counsel meeting, Bengtson said: "I'm not sure his order is appropriate in this circumstance." By

12 that statement, he apparently meant that there was no point in having such a meeting. Judge

13 Davila told him: "Get it done. Just get it done."

14     Bengtson did not get it done. The four deposition dispute reports were filed unilaterality

15 by plaintiffs on May 6, 2016 without the meet and confer having occurred. Defendants'

16 opposition was filed a few days later. In the opposition, Bengtson argued that a meet and confer

17 between lead counsel would have been a waste of time because neither Davis nor Alfert was

18 present at the depositions. Obviously, that argument simply assumes someone who was not at the

19 deposition could not meaningfully discuss what went on. That argument is nonsense. Lead

20 counsel could be briefed by the lawyer who was there. More to the point, they could review the

21 transcripts. They could look at the videos. The undersigned was not at the depositions either, but

22 no one suggests that this court cannot decide whether improper coaching was going on. Not only

23 was a meet and confer appropriate, but it should have been done as soon as problems arose and

24 before further depositions were taken, before the discovery disputes turned into a juggernaut.

25     Bengtson intimated to Judge Davila at the April 25th hearing that Davis did not have time

26 anytime soon to meet with Alfert. He expanded on that argument in the opposition to the

27 discovery dispute reports by representing that Davis was in "back-to-back-to-back trials" from

28 March 21 until April 29. No particulars are offered. The first two depositions occurred almost a

month before March 21, and the other two were also taken well before then. There is no convincing showing made that a meeting could not have been fitted in. The court believes that it did not happen because Bengtson (and, presumably, Davis) decided it was not necessary. This despite the Standing Order, and despite the specific directive from Judge Davila. The court concludes that some remedial action is warranted for defense counsel flouting orders of the court, a decision that adversely interfered with the discovery dispute resolution process.[5]

**CONCLUSION**

1. The court denies plaintiffs' request for monetary and nonmonetary sanctions on account of Bengtson's conduct during the depositions of Vieira, Olague, Henriquez, and Acharya.

2. Bengtson is ordered to study the Northern District of California's Guidelines for Professional Conduct, especially section 9, sub h through l. He shall discuss the Guidelines, especially section 9, sub h through l with Davis. He shall within 10 days from this order file a declaration verifying that he has done so and signifying that he understands what is expected of him.

3. Both Bengtson and Davis are ordered to study the Standing Order and within 10 days submit a declaration verifying they have done so and signifying they understand what is expected of them.

4. Under the court's inherent authority, Bengtson is sanctioned $200 and Davis $100, to be paid to the Clerk of the Court.

SO ORDERED.

Dated: August 18, 2016

_____
HOWARD R. LLOYD
United States Magistrate Judge

---

[5] The court rejects as undocumented and unpersuasive Bengstson's claim in the opposition that Davis twice called and left messages for Alfert to meet and confer. There is no indication when these calls were made or exactly what the message supposedly was.